IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br>*Plaintiff*, <br><br>v. <br><br> HUIJING ZHOU, <br><br>*Defendant.* | No. 19 CR 158-3 <br><br> Judge Virginia M. Kendall |

### MEMORANDUM OPINION AND ORDER

Defendant Huijing Zhou, who is neither a U.S. citizen nor an English speaker, pleaded guilty to conspiring to commit money laundering. He now seeks to withdraw his guilty plea. (Dkt. 276). Zhou contends that he would not have pleaded guilty had he understood the immigration consequences of doing so and the elements of the offense. For the following reasons, Zhou's motion is granted.

### BACKGROUND

The following facts are undisputed. Zhou is a Chinese citizen and a U.S. permanent resident. (Dkt. 220 at 13). He does "not speak, read, or write English." (Dkt. 276-2 at 1). In 2010, Zhou immigrated to Oregon; he has lived there since, with his wife, infant daughter, mother, and brother. (*Id.* at 4; Dkt. 220 12–13). Zhou's wife, daughter, and mother are all U.S. Citizens. (Dkt. 276-2 at 4; Dkt. 220 at 12–13).

A.   **The Change-of-Plea Hearing**

On October 21, 2022, at a video-conferenced change-of-plea hearing, Zhou pleaded guilty to conspiracy to commit money laundering. (Dkts. 211, 212). After swearing in Zhou and his interpreter at the virtual colloquy, (Dkt. 276-4 at 3:1–17), the Court admonished Zhou according

1

to Rule 11(b)(1)(B)–(N). *See* Fed. R. Crim. P. 11(b)(1). The Court's questions, and Zhou's answers, as interpreted, included the following:

> COURT: This plea agreement is written in English. When you went over it with your attorneys, did you review it with the aid of an interpreter?
>
> ZHOU: Yes. . . .
>
> COURT: You've been working with two attorneys, Mr. [Lawrence] Hyman and Mr. [Gal] Pissetzky on this plea agreement. When you reviewed it with them, did you ask them questions, and did they answer those questions for you?
>
> ZHOU: Yes.
>
> COURT: Do you think you've had enough time to review the plea agreement?
>
> ZHOU: Yes. Yes, I received enough time.
>
> COURT: Do you need any time to talk to your attorneys today before you enter into this plea agreement?
>
> ZHOU: No, thank you.
>
> COURT: Are you satisfied with their representation of you?
>
> ZHOU: Okay, satisfied. . . .
>
> COURT: Now, you are going to be pleading to Count One, which is the conspiracy to commit money laundering. Is that your understanding?
>
> ZHOU: Yes, I understand.

(Dkt. 276-4 at 3:24–4:3; 5:1–15; 5:23–6:1).

The Court went on to ensure that Zhou understood the maximum penalty; restitution; the special assessment; the sentencing guidelines; sentencing factors; his trial and appeal rights; and his attorneys' reservation of his right to argue that he did not know he had laundered drug-trafficking proceeds. (*Id.* at 6:23–14:13). The Government then explained what it intended to prove at trial, which Zhou acknowledged. (*Id.* at 14:14–19:4). Putting the offense in his own words, Zhou said: "I assist [co-defendant] Mr. Minghan Chen to wash money, and I knew the money came from

2

illegal activity." (*Id.* at 19:5–13). Zhou then pleaded guilty, and the Court accepted his plea. (*Id.* at 19:14–19).

An explanation of possible immigration consequences appeared in Paragraph 26 of Zhou's plea agreement:

> Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which defendant is pleading guilty. Indeed, because defendant is pleading guilty to an offense that is an "aggravated felony" as that term is defined in Title 8, United States Code, Section 1101(a)(43), removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his guilty plea may entail, even if the consequence is his automatic removal from the United States.

(Dkt. 212 at 18).

During the hearing, the parties failed to prompt an admonishment about the possible immigration consequences of pleading guilty, and Zhou did not receive such an admonishment. *See* Fed. R. Crim P. 11(b)(1)(O).

**B.     Events Surrounding the Hearing**

Four days before the change-of-plea hearing, on October 17, 2022, Zhou's attorneys gave the draft plea agreement to Zhou's interpreter, Jane Hu. (Dkt. 276-1 at 1). Hu "did not have time to formally translate the entire document," so she "interpreted the document over the phone for Mr. Zhou," without an attorney present. (*Id.*; Dkt. 276-2 at 2). Zhou's attorneys never "went line-by-line over the plea agreement with [him] and an interpreter." (Dkt. 276-2 at 2). According to Hu's affidavit, Zhou's interactions with his attorneys in the days before the hearing were "rushed": "Zhou was reluctant to plead guilty and had insisted on his innocence and desire to proceed to trial, but did not change his mind until these last-minute meetings." (Dkt. 276-1 at 1).

Leading up to the hearing, Zhou became "aware that the plea could have some potential immigration consequences." (Dkt. 276-2 at 2). Around October 19, 2022, Zhou spoke to Hyman on the phone, with Zhou's friend Danny Chen translating. (*Id.*; Dkt. 276-3 at 1). Hyman "urged" Zhou to plead guilty. (Dkt. 276-3 at 1). When Zhou asked Hyman about possible deportation, Hyman said that Zhou "did not need to worry about immigration issues until after the criminal case concluded and [he] had been sentenced." (Dkt. 276-2 at 2). Hyman assured Zhou that two of his other clients with similar cases had not faced deportation." (*Id.*) Hyman also advised Zhou that he "did not need to consult with an immigration attorney." (*Id.*) Rather, Zhou "should wait until after the sentencing hearing to contact an immigration attorney," Hyman explained, because doing so earlier might "confuse" Zhou. (*Id.* at 2–3). That meeting impressed on Zhou that he "should not worry about being deported" if he decided to plead guilty. (*Id.* at 3).

During a Zoom meeting that evening, with Hu translating and Chen present, Pissetzky told Zhou "that immigration consequences were possible, but that [Pissetzky] was not an immigration attorney." (*Id.*; *accord* Dkt. 276-1 at 1). Because of his earlier conversation with Hyman, his lead attorney, Zhou "remained under the impression that [he] did not need to concern [himself] with immigration consequences." (Dkt. 276-2). Zhou also told Pissetzky he had "reservations about pleading guilty because [he] did not do anything 'knowingly.'" (*Id.*) "[O]n numerous occasions" previously, Zhou's attorneys had said, "it did not matter if [he] did it 'knowingly' and the only thing that mattered was that [he] performed the acts in question." (*Id.*) During previous meetings at which Hu interpreted, in her words, "the attorneys had explained to Mr. Zhou that it did not matter if he knew the source of the proceeds so long as he performed the acts in question as part of the 'criminal chain.'" (Dkt. 276-1 at 1). Because of Zhou's reservation, Pissetzky changed the words "narcotic proceeds" to "unlawful activities" in the draft plea agreement. (*Id.*)

4

The next day, on October 20, 2022, Zhou emailed Pissetzky to ask whether the draft plea agreement had been revised based on their discussion. (Dkt. 276-2 at 4). Pissetzky replied that Zhou was "not admitting to knowing that the money was drug proceeds." (*Id.*) Around the same day, Zhou asked Hu if he should consult an immigration attorney, and she replied that she could not offer legal advice. (*Id.*) At the change-of-plea hearing the following day, Zhou attests that he "answered 'yes' to all the questions asked of [him] by the judge per Mr. Hyman's advice." (*Id.*)

After pleading guilty, Zhou learned from an immigration attorney—to his "greatest dismay"—that his "deportation was an inevitable consequence of [his] plea." (Dkt. 276-2 at 4). Had Zhou known as much, he attests, he would not have pleaded guilty. (*Id.*) Since Zhou's family lives in the United States, and he "has built [his] entire life here in this country," staying here is his "greatest concern when considering the potential outcomes of my case." (*Id.*) Along similar lines, Chen attests that he "do[es] not believe that Mr. Zhou was aware of the deportation consequences he faced prior to pleading guilty." (Dkt. 276-3 at 2).

In September 2023, after obtaining new defense counsel and gathering evidence, Zhou moved to withdraw his guilty plea. (Dkt. 276). The Government opposes the motion. (Dkt. 283). During a status hearing on December 12, 2023, this Court indicated that it was inclined to allow Zhou to withdraw the plea but would research the necessity of an evidentiary hearing. Although the Government's response brief argues that an evidentiary hearing on Zhou's motion is unnecessary, (*id.* at 24–25), upon learning of the Court's inclination at the December status hearing, the Government changed its tune and requested an evidentiary hearing. The Government also explained that if Zhou goes to trial, it must happen soon: in the summer of 2024, a cooperating witness will likely face deportation upon completing his sentence.

5

**DISCUSSION**

After accepting a defendant's guilty plea but before sentencing, the Court may allow the defendant to withdraw his plea if he shows a fair and just reason for withdrawal. *United States v. Harper*, 934 F.3d 524, 528 (7th Cir. 2019) (quoting Fed. R. Crim. P. 11(d)(2)(B)). Yet, a defendant's right to withdraw a plea before sentencing is not absolute. *United States v. Collins*, 796 F.3d 829, 834 (7th Cir. 2015). There are "three broad reasons that may justify allowing a defendant to withdraw a guilty plea: (1) the defendant is innocent; (2) the defendant received ineffective assistance of counsel, and (3) the plea was not knowing and voluntary." *United States v. Kamkarian*, 79 F.4th 889, 892 (7th Cir. 2023) (citing *United States v. Barr*, 960 F.3d 906, 917–18 (7th Cir. 2020)). Those second and third reasons are both at play here.

In seeking to withdraw his plea, Zhou argues that he was not properly advised of (1) the potential immigration consequences of pleading guilty; and (2) the elements of the offense to which he pleaded. (Dkt. 276 at 6–14). Since the first argument wins the day, the Court does not reach the second. That winning argument is two-fold: Zhou contends that his attorneys' inadequate advice about immigration consequences, together with the absence of an admonishment about immigration consequences at the plea colloquy, in violation of Federal Rule of Criminal Procedure 11, add up to a fair and just reason for withdrawing his plea. Although ineffective assistance and Rule 11 error are theoretically distinct reasons for relief, in this case, they go hand in hand. *See, e.g.*, *Harper*, 934 F.3d at 529 ("[A] plea, even one that complies with Rule 11, cannot be 'knowing and voluntary' if it resulted from ineffective assistance of counsel." (quoting *Hurlow v. United States*, 726 F.3d 958, 967 (7th Cir. 2013))). That is, Zhou's claims of Rule 11 error and ineffective assistance both turn on the likelihood that information about immigration consequences would have stopped him from pleading guilty.

To ensure that a defendant enters his plea knowingly and voluntarily, the district court "must address the defendant personally in open court." Fed. R. Crim. P. 11(b)(1); *United States v. Stoller*, 827 F.3d 591, 597 (7th Cir. 2016). During this exchange, known as a Rule 11 or plea colloquy, the court informs the defendant, and ensures his understanding, of various rights and concepts relating to the plea. Fed. R. Crim. P. 11(b)(1); *Stoller*, 827 F.3d at 597. Rule 11(b)(1)(O), in particular, requires the district court to inform the defendant "that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future." Fed. R. Crim. P. 11(b)(1)(O); *United States v. Zacahua*, 940 F.3d 342, 345 (7th Cir. 2019).

But Rule 11 "does not require rigid adherence." *United States v. Blalock*, 321 F.3d 686, 688 (7th Cir. 2003). Variance from Rule 11's requirements "is harmless error if it does not affect substantial rights." Fed. R. Crim. P. 11(h). That harmlessness inquiry seeks to determine "whether the defendant's knowledge and comprehension of the full and correct information would have been likely to affect his willingness to plead guilty." *Stoller*, 827 F.3d at 597–98 (quoting *United States v. Fernandez*, 205 F.3d 1020, 1024 (7th Cir. 2000)). The validity of a plea depends on the "totality of the circumstances": relevant factors include "the complexity of the charge, the defendant's level of intelligence, age and education, whether the defendant was represented by counsel, the judge's inquiry during the plea hearing and the defendant's statements, as well the evidence proffered by the government." *United States v. Blalock*, 321 F.3d 686, 688–89 (7th Cir. 2003) (quoting *United States v. LeDonne*, 21 F.3d 1418, 1423 (7th Cir. 1994)). At bottom, the defendant must demonstrate why a departure from Rule 11 mattered to him. *Stoller*, 827 F.3d at 598.

Moreover, a guilty plea is no "meaningless act." *Collins*, 796 F.3d at 834 (citing *United States v. Ellison*, 798 F.2d 1102, 1106 (7th Cir. 1986)). "Courts should not upset a plea solely

7

because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should look instead to contemporaneous evidence to substantiate a defendant's express preferences." *Lee v. United States*, 582 U.S. 357, 369 (2017); *accord Zacahua*, 940 F.3d at 345. Since the defendant's representations at a change-of-plea hearing deserve a presumption of truth, if his reason for withdrawing his plea contradicts his answers at the hearing, he "faces an uphill battle." *Collins*, 796 F.3d at 834 (citations omitted and cleaned up).

Paralleling Rule 11's harmlessness inquiry, a claim for ineffective assistance of counsel requires showing prejudice from the counsel's deficient performance. In the guilty-plea context, establishing ineffective assistance requires a defendant to show, first, that counsel's performance fell below an objective standard of reasonableness," and second, that "there is a reasonable probability that but for the errors, the defendant would not have pleaded guilty." *Harper*, 934 F.3d at 529 (citing *Hill v. Lockhart*, 474 U.S. 52, 57–59 (1985)).

The Supreme Court's decision in *Padilla v. Kentucky*, which inspired Rule 11(b)(1)(O), shows how ineffective-assistance and Rule 11 error claims are intertwined in cases like this one. *See* 559 U.S. 356 (2010); *see also* Fed. R. Crim P. 11(b)(1)(O) advisory committee's note to 2013 amendments (discussing *Padilla*). Acknowledging that "deportation is a particularly severe 'penalty,'" *Padilla* held that a defense attorney gave his client ineffective assistance by misadvising him about the risk of deportation. *Padilla*, 559 U.S. at 365, 368–69 (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893)). *Padilla* was "not a hard case in which to find deficiency." *Padilla*, 559 U.S. at 368–69. While the defendant's "deportation was presumptively mandatory," his counsel falsely assured him that he would not face removal upon conviction. *Id.* That advice was flawed. *Id.* at 369. Recognizing the complexities of immigration law, however, the Court set out guideposts for criminal defense attorneys representing noncitizens:

8

> When the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear.

*Id.*

Here, like in *Padilla*, Zhou would almost certainly face deportation upon completing his sentence, which the Government does not dispute. Yet, Zhou insists that he did not appreciate his risk of deportation when he pleaded guilty. And the affidavits of Hu and Chen corroborate Zhou's version of events. Although Zhou acknowledges having some awareness of possible immigration consequences, he received conflicting and improper advice from his attorneys. Most concerning, Hyman warned Zhou against consulting with an immigration attorney and told Zhou not to worry about deportation. Hyman further assured Zhou that other similarly situated clients had not faced deportation.

Nonetheless, in the Government's view, Zhou had sufficient notice of his near-certain deportation because he repeatedly asked his attorneys, and even his interpreter, about immigration consequences; because Pissetzky mentioned "possible" immigration consequences to Zhou; and because Hu orally translated Paragraph 26 of the plea agreement to Zhou once over the phone without an attorney present. (Dkt. 283 at 16). Not so. Since Zhou's deportation consequence was "truly clear," his counsel's duty was "equally clear." *See Padilla*, 559 U.S. at 369. With mixed messages and false assurances about immigration consequences—despite Zhou's obvious concern about the matter—defense counsel's performance fell far short of objective reasonableness.

That deficient advice culminated in a failure, by defense counsel and the Government, to prompt an immigration admonishment at Zhou's plea colloquy. *See Zacahua*, 940 F.3d at 347 (emphasizing that "the prosecutor and defense counsel share the responsibility of ensuring the

9

district court complies with the requirements of Rule 11"). The missing admonishment, the parties agree, was a Rule 11 error. *See* Fed. R. Crim. P. 11(b)(1)(O).

Zhou's motion for withdrawal—analyzed under Rule 11's harmlessness inquiry or the ineffective-assistance prejudice prong—therefore turns on whether he would have pleaded guilty with adequate information about his risk of deportation. Zhou insists not, and the record supports his claim. More than it suggests adequate notice, Zhou's concern about immigration consequences ahead of the change-of-plea hearing indicates that proper advice could have dissuaded him from pleading guilty. Increasing that probability, Zhou has lived in the United States with his family for over a decade; plus, his mother, wife, and infant daughter are all U.S. citizens. These undisputed facts demonstrate a reasonable probability that, with adequate advice or an immigration-consequences admonishment, Zhou would have opted for trial.

Resisting this conclusion, the Government relies primarily on the Seventh Circuit's decision in *United States v. Zacahua*, 940 F.3d 342, which is distinguishable. There, the defendant complained about the absence of a Rule 11(b)(1)(O) admonishment for the first time on appeal, triggering plain-error review. *Id.* at 344. Although the *Zacahua* Court stressed that the missing admonishment was "far from inconsequential and entirely preventable," it did not rise to the level of plain error. *Id.* at 346–47 (quoting *United States v. Polak*, 573 F.3d 428, 432 (7th Cir. 2009)). That may not have been so, the Court implied, had its review been for harmless error—the applicable standard of review in this case. *See Zacahua*, 940 F.3d at 346 (distinguishing *United States v. Gonzales*, 884 F.3d 457 (2d Cir. 2018) (per curiam), and observing that, under harmless-error review, "the burden rest[s] with the government").

Even setting aside the standard of review, Zhou's reason for withdrawal is much stronger than *Zacahua*'s. Importantly, that defendant "had notice of his high risk of deportation" before

10

pleading guilty: the district court and government had discussed the defendant's likely deportation at his bond hearing. *Id.* at 345. By contrast, there have been no discussions of Zhou's likelihood of deportation on the record here. Also unlike this case, the *Zacahua* defendant's statements to his probation officer soon after the change-of-plea hearing and during his sentencing showed that "he accepted his eventual return to Mexico," where his family lived. *Id.* at 344–46 (distinguishing *United States v. Ataya*, 884 F.3d 318 (6th Cir. 2018), where the defendant had voiced "contemporaneous concerns . . . about returning to Syria"). Apart from "*post hoc* assertions," the defendant "failed to present any evidence that had he known of the immigration consequences of his conviction, he would have been reasonably likely to proceed to trial." *Id.* at 346. Zhou, as explained, has offered more than *post hoc* assertions showing that if he had appreciated his risk of deportation when he pleaded guilty, he likely would have taken his chances at trial. That is a fair and just reason for withdrawing his plea.

In so concluding, the Court sees no need to conduct an evidentiary hearing. Where, as here, a defendant has substantiated his motion for withdrawal with compelling evidence, the district court "must permit the withdrawal of the guilty plea, conduct an evidentiary hearing, or deny the motion with an explanation as to why the evidence is insufficient or incredible." *See United States v. Silva*, 122 F.3d 412, 415 (7th Cir. 1997) (citing *United States v. Groll*, 992 F.2d 755, 758 (7th Cir. 1993)). The Government has not suggested that it could raise any factual disputes calling Zhou's fair and just reason into question. Considering the Government's need to try Zhou quickly—before the impending deportation of its cooperator—the parties' and the Court's resources will be better spent in preparing for trial.

**CONCLUSION**

For the reasons above, Zhou's motion to withdraw his guilty plea [276] is granted.

_____
Virginia M. Kendall
United States District Judge

Date: January 10, 2024